# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2007 OCT -9 PM 3: 51
LORETTA G. WHYTE
CLERK

| | | |
|---|---|---|
| UNITED STATES EX REL. | ) | CIVIL ACTION |
| ROBYN WILLIAMS | ) | |
| | ) | NO. _____ |
| Plaintiff-Relator, | ) | |
| | ) | SECTION: _____ 07 - 6592 1 |
| | ) | |
| v. | ) | MAGISTRATE: _____ SECT. R MAG. 1 |
| | ) | |
| C. MARTIN COMPANY, INC. | ) | FILED IN CAMERA AND |
| LAURA CRAIG, MEDLEY JARVIS | ) | UNDER SEAL |
| INDUSTRIES, INC., W. BEN MEDLEY, | ) | |
| MICHAEL JARVIS, and SHAW | ) | JURY TRIAL REQUESTED |
| ENVIRONMENTAL, INC., | ) | |
| | ) | |
| Defendants. | | |

## ORIGINAL COMPLAINT FOR DAMAGES

\* Filed Under Seal Pursuant to the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*

___ Fee $350.00
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES EX REL. | ) | CIVIL ACTION |
| ROBYN WILLIAMS | ) | |
| | ) | NO. _____ |
| Plaintiff-Relator, | ) | |
| | ) | SECTION: _____ |
| | ) | |
| v. | ) | MAGISTRATE: _____ |
| | ) | |
| | ) | |
| C. MARTIN COMPANY, INC. | ) | **FILED IN CAMERA AND** |
| LAURA CRAIG, MEDLEY JARVIS | ) | **UNDER SEAL** |
| INDUSTRIES, INC., W. BEN MEDLEY, | ) | |
| MICHAEL JARVIS, and SHAW | ) | JURY TRIAL REQUESTED |
| ENVIRONMENTAL, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

1.

This is a *qui tam* action by Plaintiff-Relator Robyn Williams ("Relator"), for herself and on behalf of the United States, to recover damages and civil penalties pursuant to the False Claims Act, 31 U.S.C. § 3729-3733.

2.

This action involves a coordinated effort by the defendants to defraud the United States government, in numerous ways, on disaster relief contracts totaling in excess of $230 million of federal funds, which were intended to benefit the victims of Hurricanes Katrina and Rita.  As discussed in more detail below, these contracts were for the maintenance, inspection, servicing, and deactivation of thousands of temporary housing units and numerous group sites in the State of Louisiana.  With defendants Ben Medley,

Michael Jarvis, and Medley Jarvis Industries, Inc. as instigators and initiators of this joint, unlawful effort, defendant C. Martin Company, Inc. ("CMC") made numerous misrepresentations in the application process for these contracts, including (i) misrepresenting its qualifications as a Service-Disabled Veteran-Owned Small Business, (ii) misrepresenting its entitlement to preferential treatment as a local business, and (iii) misrepresenting its ability and intention to perform under the contracts.  Additionally, CMC committed numerous false and fraudulent acts in the performance of such contracts, including (i) deliberately failing to ensure that it had sufficient personnel to perform its contractual duties, (ii) failing to perform numerous services for which it was being paid, and (iii) misrepresenting that it had performed such services.  As discussed in more detail below, each of the other defendants had knowledge of or otherwise participated in one or more of CMC's false and fraudulent acts.  All defendants are liable to the United States for the resulting false and fraudulent claims, as well as for conspiring to defraud the Government by getting false or fraudulent claims allowed or paid.

I.      **Jurisdiction and Venue**

3.

This action arises under the False Claims Act, 31 U.S.C. § 3729-33.

4.

Jurisdiction over this action is vested in this Court by 31 U.S.C. § 3732(a), 31 U.S.C. § 3730(h), and 28 U.S.C. § 1331, in that this action arises under the laws of the United States.

5.

Venue is proper in this district under 31 U.S.C. § 3732(a). At least one of the Defendants can be found, resides, or transacts business within the district, and many of the acts forming the basis of this action occurred within the district.

## II.   The Parties and Related Entities

6.

C. Martin Company, Inc. ("CMC") is a California corporation with its principal place of business in North Las Vegas, Nevada.  Laura Craig is the president and majority shareholder of CMC.  CMC is primarily a facilities maintenance contractor, providing various maintenance, operations, security, and other support services to the government and others.

7.

Medley Jarvis Industries, Inc. ("Medley Jarvis") is a Delaware corporation.  It was formed in early 2005 by W. Ben Medley and Michael Jarvis, for the purpose of pursuing federal government contracts.  Defendant W. Ben Medley previously had been the President of DynCorp Technical Services Inc.

8.

Shaw Environmental, Inc. ("Shaw") is a Louisiana corporation.

## III.   The Hurricane Relief Contracts

9.

In response to the devastation caused by Hurricanes Katrina and Rita in the fall of 2005, FEMA took a number of steps to provide relief to displaced persons, including providing a large number of temporary housing units, such as mobile homes and

manufactured housing.  Many of these temporary housing units were grouped together in areas known as group sites, which might contain fewer than 50 or more than 600 units.

10.

In October 2005, Ben Medley and Mike Jarvis of Medley Jarvis informed Laura Craig of CMC that they had heard about potential contracts the government was going to let for the maintenance and upkeep of such temporary housing units and group sites. Medley Jarvis was ineligible to qualify as a local small business that would receive preference for the contracts.  Medley, Jarvis, and Craig discussed the possibility of their respective companies' pursuing such contracts together, although in the name of CMC.

11.

On February 1, 2006, CMC and Medley Jarvis entered into a "Consulting Agreement," under which Medley Jarvis agreed to, among other things, identify potential government contracts, help prepare responses to requests for proposals, and provide other services.  In return, Medley Jarvis was to receive 49% of the profits from any such contracts, which on information and belief was not to be disclosed to the Government.

**A.     The Shaw Subcontracts**

12.

Shaw was the prime contractor on a contract with FEMA for, among other things, the maintenance and upkeep of various temporary housing units and group sites.  The reference number for the prime contract was HSFEHQ-05-D-0573.

13.

Medley and Jarvis put CMC in touch with Shaw, in an attempt to obtain subcontract work from Shaw and to position CMC to obtain future FEMA contracts.

4

Ultimately, CMC entered into subcontracts with Shaw to provide various different services.

14.

In January 2006, Shaw entered into a subcontract with CMC, pursuant to which CMC agreed to provide operations and maintenance services for five different group sites in Louisiana, known as Lyons Center, Wisner Playground, Avenger Park, Jefferson Flea Market, and A.L. Davis Playground (the sites were named for nearby landmarks).

15.

In May 2006, CMC entered into another subcontract with Shaw, to perform Liquefied Petroleum Gas ("LP Gas") certifications for approximately 11,000 temporary housing units. Under this contract, CMC was required to have qualified personnel perform pressure tests on LP Gas systems for each of the units, and submit proper certifications indicating that the tests had been performed.

**B.     The Maintenance and Deactivation Contract**

16.

In November 2005, FEMA published a solicitation for a contract for the maintenance and deactivation of manufactured homes and travel trailers in Texas, Louisiana, Alabama, and Mississippi. The solicitation indicated that FEMA expected to enter into seven different contracts covering different regions, with each contract covering approximately 6,700 housing units. The solicitation noted that, pursuant to the Stafford Act, 42 U.S.C. § 5150, preference would be given to local firms within the disaster area. In a subsequent letter, FEMA again reiterated that "Preference will be given to small business firms located in the State of Louisiana."

5

17.

FEMA's subsequent request for proposal set forth the mechanism for giving a

preference to local small businesses, stating as follows:

> (b) The price proposal will be evaluated, and FEMA will give a price preference
> to prices offered by small business entities who qualify as local small business
> contractors. Local small business contractors are defined as those small
> businesses who meet the small business size standard ($30 million) and who
> regularly conducted business in the State of Louisiana prior to the disaster event
> (August 29, 2005 for Hurricane Katrina). As proof, the offeror should submit a
> copy of their business license. This requirement applies to the Offeror as well as
> subcontractor(s) and/or partner(s) that are included as part of the proposal. As an
> example, if a small business contractor is local and partners with a non-local firm
> (either a subcontractor or joint venture arrangement) the entity will be considered
> non-local. The price proposal will also be evaluated for accuracy, completeness,
> and reasonableness.

> (c) If there is a local small business offer that is not otherwise the lowest priced
> offer, the Contracting Officer will determine the reasonableness of the price or
> cost of the local small business offered price by adding 30% to the price of the
> otherwise low offer. The price of the local small business offer will be deemed
> reasonable and award made at the price offered if it does not exceed the evaluated
> price of the lowest priced offer after addition of the 30% evaluation factor in
> accordance with this section.

18.

In a subsequent amendment, FEMA stated that:

> Following contract award, the contractor shall use local subcontractors,
> consultants, and partners to the maximum extent practicable. "Local" means
> within the state's geographical boundaries. Use of a non-local firm may be
> authorized only on an "exception" basis by the Contracting Officer, and the
> contractor must furnish adequate justification that shows or demonstrates that a
> local firm cannot be utilized or is unavailable.

19.

Although CMC had performed a previous contract in Louisiana, it did not have a

business license to do business in Louisiana prior to August 29, 2005. Medley Jarvis did

not regularly do business in Louisiana before August 29, 2005. Upon information and

belief, Medley Jarvis's participation in the venture was not disclosed to the government.
Upon information and belief, CMC applied for a Louisiana business license in November
or December of 2005.

20.

In or around March 2006, CMC was awarded by FEMA an Indefinite Delivery,
Indefinite Quantity, Fixed Price contract for the maintenance and deactivation of
approximately 6,700 manufactured homes and travel trailers in Louisiana. The reference
number for the contract was HSFEHQ-06-D-0381 (the "MD Contract"). The preference
given to local contractors was a material factor in CMC being awarded the contract.

21.

After a contract protest was resolved, the MD Contract was executed by FEMA
on May 5, 2006, and forwarded to CMC the next day. In a cover letter, FEMA explained
that a Post-Award Conference would be scheduled in approximately a week, at which
CMC would be informed of the area in which it would be assigned work. FEMA advised
CMC that could not begin phase-in work until receiving an assignment at the conference.

22.

The MD Contract required CMC to perform several different types of work,
including (i) phase-in work, (ii) maintenance of temporary housing units, (iii)
deactivation, removal, and transportation of temporary housing units, and (iv) customer
service and quality assurance. Many of the group sites included in the MD Contract were
sites that CMC had been servicing pursuant to its earlier subcontracts with Shaw. Upon
information and belief, for approximately a month and a half after obtaining the MD

7

Contract, CMC was double-billing the government and Shaw for many of the same housing units.

23.

With respect to the phase-in process, CMC was required to "perform any and all efforts necessary during the phase-in period to ensure the ability to successfully perform the tasks and activities associated with this contract. This task shall be completed within 30 days of contract award." Among other things, CMC was required to hire sufficient staff, obtain necessary equipment, develop a quality control system, and develop procedures for performing the required tasks. CMC was also required to capture certain information during the phase-in process, including "identification numbers and information regarding the specific models, locations, residents, etc. for each of the units to be monitored/maintained, [and] the effective dates and applicable warranty periods." CMC was to be paid a fixed amount of $624,412.03 for phase-in efforts.

24.

With respect to maintenance, CMC was required to, among other things, (i) perform monthly preventative maintenance inspections (PMI) of the housing units, (ii) respond to routine and emergency maintenance calls, (iii) make repairs, and (iv) provide pest control services. The contract required CMC to "maintain records pertaining to tasks assigned to include monthly preventive maintenance inspection, and routine and emergency maintenance. . . . The contractor shall be able to provide reports for the types of calls, and response times and individual and cumulative unit information as to what was done and/or replaced."

25.

8

CMC was to be paid a fixed amount for the various items performed.  During the first year of the five-year contract term, these amounts included the following: (i) $194.07 per unit per month for maintenance, and (ii) $219.68 for each emergency maintenance service call.  These numbers changed slightly over the term of the contract.  The total amount to be paid under the contract over its five-year term was estimated as approximately $230 million.

**C.      The Group Site Grounds Maintenance Contract**

26.

In May 2006, FEMA put out a solicitation for a Group Site Grounds Maintenance Contract, under Solicitation No. HSFEHQ-06-R-0043.  The solicitation indicated that FEMA intended to award several contracts for the maintenance and inspection of group sites in Louisiana.  The contractor's duties would include inspection, preventive maintenance, and maintenance of the grounds, utilities, infrastructures, buildings and structures, grounds facilities, waste refuse services, and site upkeep for the group sites.  The solicitation noted that it was a Service-Disabled Veteran-Owned Small Business set-aside.

27.

Although Craig was in the Navy during the Vietnam era, she was not a service-disabled veteran and did not qualify for that designation.  Nevertheless, she had discussions with Medley and Jarvis about bidding for a contract under this solicitation.  A running joke among CMC and Medley Jarvis was that, if Craig got caught and went to jail, Jarvis and Medley would make sure she got enough "Silver Oak" (a desirable wine) to keep her satisfied in the federal penitentiary.  Another joke was that Craig, who

9

occasionally did promotional events for the Navy, could claim she had fallen off the back of a parade float and hurt her back.

28.

Medley and Jarvis set up a conference call with Shaw to discuss the possibility of CMC and Shaw working together to get a contract. One of the Shaw representatives, Ed Day, asked if CMC was a service-disabled veteran-owned business, and Craig responded that it was not, but that she would have a certification before the award was made. Medley subsequently gave Craig the name of a person at the VA who could purportedly get the certification approved quickly.

29.

On or about May 24, 2006, Shaw and CMC entered into a Teaming Agreement, providing that CMC would submit a bid as prime contractor under the solicitation, and would include Shaw as a subcontractor if it received a prime contract. Although Shaw and CMC were both aware that CMC had not been certified as such, the Teaming Agreement falsely described CMC as a "Service Disabled Veteran Owned Small business."

30.

The Teaming Agreement also noted that CMC would be submitting a separate bid under the solicitation in a joint venture with another small business.

31.

On or about June 29, 2006, CMC entered into a Joint Venture Agreement with C-Tec Security & Consultant, Inc. ("C-Tec"). CMC and C-Tec agreed to form a joint venture to bid for and perform a contract under the Group Site Grounds Maintenance

10

solicitation. The Joint Venture Agreement, as originally executed, stated that CMC owned a 97.5% interest in the joint venture, with C-Tec owning a 2.5% interest. The Joint Venture Agreement stated that the name of the venture was initially to be "CMC-C-Tec (JV")," until later changed. Ultimately, the joint venture came to be known as "C-MARTEC."

32.

Laura Craig submitted documentation seeking to obtain certification of CMC as a Service-Disabled Veteran-Owned Small Business. Craig falsely claimed that she had received a back injury during her Navy service during the Vietnam era. As a result of such false certification, CMC was able to be considered as a Service-Disabled Veteran-Owned Small Business for purposes of the solicitation.

33.

Ultimately, CMC was awarded two contracts under the solicitation, one pursuant to its Teaming Agreement with Shaw, and one pursuant to its joint venture with C-Tec. The former contract was awarded to CMC, with contract number HSFEHQ-06-D-1082, and covered various group sites in Louisiana. The latter contract was awarded to C-MARTEC, with contract number HSFEHQ-06-D-1083, and also covered various group sites in Louisiana.

34.

After the contract was awarded to the CMC-C-Tec joint venture, Relator was instructed by John Huge of CMC to change the percentages in the Joint Venture Agreement, to reflect a 65% ownership interest for CMC and a 35% interest for C-Tec.

11

35.

The two contracts required CMC and CMARTEC to "maintain the group sites to ensure the sites are in a safe, secure, and sanitary condition." The contractor was required to perform numerous services, including group site and park management; maintenance inspection; plumbing, electrical, and road repair and service; site clean-up; lawn service; painting; pest control; and other services.

36.

Under each contract, CMC and/or CMARTEC were to be paid $576,271 for phase-in services, as well as various amounts for other services. The amount for many services, such as site management and maintenance inspection, varied depending on the size of each group site, which might contain fewer than 50 or more than 600 pads for housing units.

## IV.   Defendants' False and Fraudulent Acts

37.

Defendants have committed numerous false and fraudulent acts in connection with the solicitation, execution, and implementation of the various contracts discussed above.

38.

With respect to the MD Contract, CMC misrepresented its entitlement to be considered a local small business, and concealed its relationship with Medley Jarvis, an out-of-state company, thereby unfairly obtaining a price preference in the award of such contract. Upon information and belief, Medley Jarvis, Ben Medley, and Michael Jarvis were aware of and facilitated this misrepresentation. With respect to the two Group Site

Grounds Maintenance contracts, CMC falsely represented that it was properly certified as a Service-Disabled Veteran-Owned Small Business, when Craig was not in fact service-disabled, as CMC, Ben Medley, Michael Jarvis, and their firm Medley Jarvis were well aware.  Upon information and belief, Medley Jarvis, Ben Medley, Michael Jarvis, and Shaw all were aware or should have been aware that CMC did not qualify for treatment as a Service-Disabled Veteran-Owned Small Business.

39.

In addition, CMC submitted bids for the MD Contract and Group Site Grounds Maintenance contracts, entered into such contracts, and submitted claims for payment under the contracts, with the knowledge that it lacked the resources to fulfill the contract terms.  Medley Jarvis, Ben Medley, Michael Jarvis, and Shaw were or should have been aware that CMC lacked such resources.

40.

In evaluating its ability to perform the required work under the MD Contract, CMC estimated that it would require over 100 employees to perform the routine and emergency inspections and other work.  In fact, however, CMC never had anywhere close to that number of employees, but only had between 30-50 employees.

41.

Notwithstanding her awareness of CMC's inability to perform, on June 2, 2006, Craig sent a letter to FEMA, stating that CMC had successfully completed the transition for the MD Contract.  Among other things, Craig stated that CMC had hired 75% of the maintenance staff.  This statement was false, since CMC had not in fact hired 75% of the staff required to perform the contract work.  CMC misrepresented its completion of the

13

phase-in portion of the contract in order to obtain more than $600,000 in phase-in payment.

42.

In addition, CMC never completed a transition inspection of the various housing units to determine whether they were in need of significant repairs (which would have been paid by Shaw under its prior prime contract). Rather, CMC simply "completed" preventive maintenance inspection (PMI) forms for more than 5,000 units, falsely indicating that PMI inspections had been performed. CMC sent two copies of these forms to Shaw, which, upon information and belief, sent one copy to FEMA. In her June 2, 2006 letter to FEMA, Craig stated that "[a]pproximately 5900 Travel Trailers have been identified and signed for."

43.

As a result of its failure to have enough maintenance workers, CMC was never able to perform all of the inspection and maintenance duties required by the MD Contract. Among other things, the contract required monthly preventive maintenance inspections of each of the housing units. CMC was supposed to prepare a PMI form for each such inspection, indicating the work performed. CMC never performed all of the required monthly PMI inspections, but upon information and belief, likely performed no more than 15% of such inspections. Nevertheless, it received payment as if it had performed all such inspections.

44.

CMC's failure to have enough staff also resulted in other abuses. For example, the MD Contract paid CMC $194.07 per unit per month for preventive and routine

14

maintenance.  Because this was a fixed amount, CMC received this money regardless of

whether it actually did any maintenance work.  In addition to this fixed amount, however,

CMC received $219.68 for each emergency maintenance service call.  CMC thus had an

incentive to maximize its emergency calls, for which it received extra payment, at the

expense of routine and preventive maintenance, for which it received a fixed amount.

45.

Because CMC never had sufficient workers to perform all its duties, it focused on

performing as many emergency calls as it could, to the detriment of its routine and

preventive maintenance obligations.  Even then, however, CMC was not able to timely

respond to all emergency calls, and routinely developed backlogs.  Under the terms of the

contract, MDC was supposed to respond to such calls within six hours.  In order to appear

to be in compliance, and to obtain the extra payment, CMC would routinely "close" a

service call within the six-hour period, whether or not the work had been performed.  If it

later responded to a subsequent call for the same problem, it would consider this a

separate call.

46.

In addition to PMI inspections and emergency calls, CMC was required to

respond to routine maintenance calls for each of the housing units.  Because it did not

have enough maintenance workers, CMC routinely developed backlogs of service calls.

As with the emergency calls, CMC would routinely "close" out such calls without the

service having been performed.

15

47.

Although it was painfully apparent that CMC lacked the personnel to perform its duties under the contract, Craig refused to expend the money necessary to permit the hiring of sufficient additional qualified maintenance workers. To the contrary, CMC hired a number of untrained workers, such as retired nurses with no maintenance experience, as general maintenance workers.

48.

FEMA, the Contracting Officer Technical Representative, and the Technical Monitor repeatedly pressed CMC for back-up documentation regarding inspection and service calls, including a completed service order with the occupant's signature. Craig instructed CMC employees to inform FEMA that there was no specific contractual requirement for such back-up documentation. Moreover, at Craig's direction, CMC falsely "created" thousands of service call documents to make it appear that a call had been completed when it had not.

49.

CMC's failure to have sufficient personnel also affected its performance under the Group Sites Grounds Maintenance contracts and the Shaw subcontracts. At the time it entered into the Group Sites Grounds Maintenance contracts, CMC was aware that was not able to perform all of its duties under the MD Contract, much less take on additional responsibilities. Nevertheless, CMC expressly and implicitly represented that it had the resources to perform under such contracts. Indeed, in an August 28, 2006 letter to FEMA, Craig stated that:

> We would like to emphasize that we have the depth of resources available currently in the region to provide outstanding service to any amount of sites

16

the Government would like to award to us. We understand that we are responsible for service calls starting on Day 1 and are ready to receive 350 or more pads as the Government deems required.

50.

In reassuring FEMA that CMC possessed the capacity to perform under the Grounds Maintenance contracts, Craig also falsely stated that:

> The Group Site Grounds Maintenance project will be separate and distinct from any other contract C. Martin or Shaw may have with FEMA in the Gulf Coast Region. There will be no co-mingling of management unless it is found to be beneficial to both C. Martin and the Government and any changes relating to this issue would be effected only with the express written consent of the Government.

In fact, the same personnel were involved in performing and managing each contract.

51.

With respect to its subcontract with Shaw to perform LP Gas certifications for 11,000 temporary housing units, CMC never had enough qualified inspectors to perform such inspections. CMC hired unqualified individuals to perform the inspections, using the same personnel who were providing general maintenance services. Upon information and belief, CMC prepared numerous inspection reports falsely stating that LP Gas inspections had been performed.

17

## COUNT I
## FALSE CLAIMS

52.

The allegations in the preceding paragraphs are incorporated by reference.

53.

Defendants violated the False Claims Act in that they:

(1)     knowingly presented or caused to be presented numerous false claims for payment or approval to the United States in violation of 31 U.S.C. § 3729(a)(1);

(2)     knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(2);

(3)     knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(7); and

(4)     conspired to defraud the Government by getting false or fraudulent claims allowed or paid in violation of 31 U.S.C. § 3729(a)(3).

54.

As a result of Defendants' violations of 31 U.S.C. § 3729, the United States has suffered damages in an amount to be determined at trial.

WHEREFORE, Relator, on behalf of herself and the United States, prays:

(a)     That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants'

actions, plus a civil penalty of between $5,500 and $11,000 for each violation of 31 U.S.C. § 3729;

(b)   That Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim if the United States intervenes, and not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim if the United States does not intervene;

(c)   That Relator be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

(d)   That the Court order such other relief as is appropriate.

Trial by jury is hereby requested.

Respectfully submitted,

J. Marc Vezina, LA BAR #24683
VEZINA AND GATTUSO, L.L.C.
P. O. Box 461, 401 Weyer Street
Gretna, Louisiana  70053
(504) 368-5223
(504) 361-3624  (fax)
jmv@vezinagattuso.com

G. Mark Simpson
Georgia Bar No. 647725
Simpson Law Firm, LLC
165 North Main Street
Jonesboro, GA 30236
(678) 610-1994
(678) 302-8721 (fax)
mark@marksimpsonlaw.com

19

Michael A. Sullivan, T.A.
Georgia Bar No. 691431
Finch McCranie, LLP
225 Peachtree St., Suite 1700
Atlanta, Georgia 30303
(404) 658-9070
(404) 688-0649 (fax)
msullivan@finchmccranie.com

Attorneys for Plaintiff-Relator