**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**ROBYN WILLIAMS**                                    **CIVIL ACTION**

**VERSUS**                                            **NO. 07-6592**

**C MARTIN COMPANY INC, ET AL**                       **SECTION "H"(1)**

**ORDER AND REASONS**

Before the Court are six Motions for Summary Judgment (Docs. 249, 250, 251, 256, 257 & 258), two Motions to Exclude Experts (Docs. 248 & 259), a Motion for Sanctions (Doc. 254), and two Motions *in limine* (Docs. 316 & 321).  On February 28, 2014 the Court heard oral argument and ruled on certain motions.  The Court now issues written reasons and rules on the remaining motions.  The following Motions are GRANTED: Docs. 256 & 316.  The following Motions are GRANTED IN PART: Docs. 248, 251 & 259.  The following Motions are DENIED: Docs. 249, 250, 254, 257, 258, 321.  Doc. 270 is DENIED AS MOOT.

1

**BACKGROUND**

Relator, Robyn Williams, filed this *qui tam* action on behalf of the United States to recover damages under the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"). Relator alleges Defendants, Laura Craig ("Craig"), C. Martin Company, Inc. ("CMC"), Michael Jarvis ("Jarvis"), W. Ben Medley ("Medley"), and Medley Jarvis Industries, Inc. ("MJI") conspired to fraudulently induce the Federal Emergency Management Agency ("FEMA") to award several post-Katrina disaster recovery contracts to CMC. The specific facts underlying each of Relator's three claims are outlined below.

### A. Fraudulent Inducement Claim One – The Local-Bid Preference Claim

On November 29, 2005, FEMA published a Request for Proposal ("RFP") seeking bids on a "Maintenance and Deactivation of Manufactured Homes and Travel Trailers" contract ("MD Contract"). The RFP stated that only small businesses would be considered for the contracts and that a preference would be given to local Louisiana businesses. CMC won the contract. In its proposal, CMC represented that it was a local Louisiana small business. Relator contends this was a fraudulent misrepresentation for two reasons: (1) CMC did not qualify as a "local business" as defined by FEMA in the RFP, and (2) even if CMC qualified as a "local business", CMC lost its local business status by entering into a joint venture with a non-local entity, MJI.

### B. Fraudulent Inducement Claim Two– The Service-Disabled-Veteran Claim

In May 2006, FEMA published a solicitation for bids on a Group Site Maintenance contract ("GSM Contract"). The solicitation stated that the contracts were a "service-disabled-

2

veteran-owned small-business set-aside," meaning that only small businesses which were primarily owned by a service-disabled-veteran were eligible to receive the contracts.  CMC won a contract based on its representation that CMC's majority shareholder, Laura Craig, was a service-disabled-veteran.  The Small Business Administration ("SBA") contested the award to CMC on the grounds that Craig was not a service-disabled-veteran.  The contract was revoked because Laura Craig could not produce documentation evidencing her status as a service-disabled-veteran.

### C. The Performance Claim

On this claim, Relator argues that CMC fraudulently failed to fulfill its obligations under the MD Contract.  Relator alleges two acts of fraud on the part of CMC: (1) that CMC falsely certified that it complied with the "phase-in" requirements of the contract, and (2) that CMC falsified inspection forms, thus billing the government for work that was never completed.

### LEGAL STANDARD

### I. Motion for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2012).  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor. *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528 (5th Cir. 1997).  "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."  *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995).  Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "In response to a properly supported motion for summary judgment, the nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the nonmovant on all issues as to which the nonmovant would bear the burden of proof at trial." *John v. Deep E. Tex. Reg. Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).  "This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.  We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal citations omitted).  "We

do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Badon v. R J R Nabisco, Inc.*, 224 F.3d 382, 394 (5th Cir. 2000) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).  Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion." *Boudreaux v. Banctec, Inc.*, 366 F. Supp. 2d 425, 430 (E.D. La. 2005).

### II. Motion to Exclude Expert

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;(b) the testimony is based on sufficient facts or data;(c) the testimony is the product of reliable principles and methods; and(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702.  The current version of Rule 702 reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  The threshold inquiry is whether the expert possesses the requisite qualifications to render opinion on a particular subject matter.  *Wagoner v. Exxon Mobil Corp.*, 813 F.Supp.2d 771, 799 (E.D.La.2011); *see also Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in

a particular field or on a given subject.").  Having defined the permissible scope of the expert's testimony, a court next inquires whether the opinions are reliable and relevant.  *See United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).  In undertaking this tripartite analysis, courts must give proper deference to the traditional adversary system and the role of the jury within that system.  *See Daubert*, 509 U.S. at 596.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Id.*  As the "gatekeeper" of expert testimony, *id.* at 597, the trial court enjoys broad discretion in determining admissibility.  *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013).

### III. Motion for Sanctions – Spoliation

The spoliation of evidence doctrine concerns the intentional destruction of evidence.  *Lafayette Ins. Co. v. CMA Dishmachines*, No. Civ.A. 03–1098, 2005 WL 1038495, at *3 (E.D. La. Apr. 26, 2005).  If a party intentionally destroys evidence, the trial court may impose sanctions on the responsible party.  *Savarese v. Pearl River Navigation*, No. 09–129, 2010 WL 1817758, at *2 (E.D. La. Apr. 30, 2010).  Such sanctions may include an instruction to the jury that the evidence was spoiled because it was unfavorable to the spoiling party's case, exclusion of the spoiled evidence, or dismissal of the entire case.  *Lafayette*, 2005 WL 1038495 at * 3.  Exclusion of evidence, much less dismissal of the case, "is a 'drastic sanction' that courts generally try to avoid."  *Id.*  The preferred alternative is an adverse inference in favor of the non-spoling party.  *Savarese*, 2010 WL

6

1817758 at *3.  The decision to admit evidence of spoliation and to instruct the jury on adverse inferences is within this Court's sound discretion.  *United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000).

## LAW AND ANALYSIS

### I. Motions for Summary Judgment – Docs. 249, 250, 251, 256, 257 & 258

The parties have essentially filed cross-motions for summary judgment on Relator's two fraudulent inducement claims.  Additionally, Defendants have moved to dismiss Relator's performance claim.  All of Relator's claims are governed by the FCA.

Generally, a person is liable under the FCA if: (1) the person makes a false statement or initiates a fraudulent course of conduct; (2) the false statement is made knowingly; (3) the false statement is material to the government's decision to pay money; and, (4) the false statement actually causes the government to pay out money.  *U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009).  As to the second element, a person acts knowingly when he or she has actual knowledge of the information communicated to the government and either (1) "acts in deliberate ignorance of the truth or falsity of the information"; or (2) "acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b).  The FCA's "*mens rea* requirement is not met by mere negligence or gross negligence."  *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338 n.9 (5th Cir. 2008).  "The evidence must demonstrate 'guilty knowledge of a

7

purpose on the part of [the defendant] to cheat the government,' or 'knowledge or guilty intent.'" *U.S. ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008). With regard to the third element, a false statement is "material" if it "ha[s] the potential to influence the government's decisions." *Longhi*, 575 F.3d at 470.

Additionally, a person who does not directly submit a false claim to the government may still be liable under the FCA. The FCA also "applies to anyone who knowingly assist[s] in causing the government to pay claims grounded in fraud, without regard to whether that person ha[s] direct contractual relations with the government." *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004). "Thus, a person need not be the one who actually submitted the claim forms in order to be liable." *Id.*

Finally, a person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid" is subject to FCA liability. 31 U.S.C. § 3729(a)(3). To sustain a conspiracy cause of action under the FCA, Relator must be able to show (1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by the United States and (2) at least one act performed in furtherance of that agreement. *See United States ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F.Supp. 2d 487, 509 (S.D.Tex.2003).

Relator seeks summary judgment on her two fraudulent inducement claims, and Defendants seek summary judgment on all claims. Each claim is addressed in turn.

8

**A. The Local-Bid preference Claim**

In November 2005, FEMA published the RFP for the MD contract.  The RFP stated that "local businesses" would receive a 30% price preference.  In other words, all bids which did not come from "local businesses" would be increased by 30% before comparison with local bids.  The RFP stated that a business would be considered "local" if it regularly conducted business in Louisiana prior to August 29, 2005 (the date Hurricane Katrina made landfall).  Additionally, the RFP made it clear that a successful "local preference" bidder would be required to utilize 100% local subcontractors and partners.  Relator offers two arguments in support of her claim that CMC fraudulently represented itself as a local business.

Relator first contends that CMC did not qualify as a local business.  CMC argues that it regularly conducted business in Louisiana prior to Hurricane Katrina and thus was clearly a local business.  In support of this argument, CMC alleges it was a subcontractor on a contract related to a military base in Rapides Parish prior to 2005.  Relator does not dispute that CMC worked on the military contract or that CMC otherwise regularly conducted business in Louisiana before Katrina. Instead, Relator notes that, in response to various questions posed to it regarding the RFP, FEMA stated that a business must have had a business license in effect prior to Katrina in order to qualify as a local business.  Relator claims that CMC lacked such a license.

The facts surrounding CMC's business license are disputed. At the time the RFP was published, CMC did not have a business license in Louisiana.  However on November 14, 2005, prior

to bidding on the contract, CMC submitted an application to Rapides Parish for an occupational license. Rapides Parish granted a license effective June 1, 2005. CMC claims this retroactive grant of the license renders it compliant with the FEMA definition of local business. CMC also argues the license is merely a formality and that CMC clearly qualified as a local business because it was actually doing business in Louisiana prior to Katrina. The Court find that there is a genuine dispute of material fact regarding whether CMC was a local business as defined by FEMA. There is evidence in the record from which a jury could conclude that FEMA intended the business license requirement to be a litmus test for "local business" status. Alternatively, there is substantial evidence from which a jury could conclude that having a business license was simply one way for a bidder to demonstrate local status. In light of this factual dispute, the Court declines to grant summary judgment.

Relator also claims CMC entered into an impermissible Joint Venture with MJI regarding the MD contract. All parties agree that if CMC and MJI actually entered into a joint venture, CMC would not qualify for the local bid preference. However, there is a clear dispute of material fact regarding the nature of the agreement between CMC and MJI. There is evidence that indicates CMC and MJI actually entered into two agreements, an oral agreement and a written agreement. Defendants contend that their relationship was nothing more than a consulting agreement and they never intended to operate as a joint venture. However, Relator has offered evidence from which a jury could conclude that CMC and MJI intended to operate as a joint venture. Relator

10

argues that Defendants confected an oral agreement to jointly perform on the MD Contract in exchange for a 51/49 split of the profits. Relator insists that the written consulting agreement was executed after the contract was awarded to CMC in order to deceive FEMA as to the true nature of the agreement between CMC and MJI. Additionally, there is evidence in the record that Medley and Jarvis substantially contributed to CMC's performance on the MD Contract. Given these factual disputes regarding both the intent and conduct of CMC and MJI, the Court declines to grant summary judgment.

Finally, Defendants argue that Relator has failed to prove that FEMA would not have awarded the contract to CMC, even if CMC's bid was increased by 30%. Essentially, Defendants argue that Relator has failed to demonstrate that the allegedly false statement was material. Under the FCA a false statement is material if it has a natural tendency to influence or is capable of influencing the decision of the decision-making body to which it is addressed. In *Longhi*, the Fifth Circuit held that a relator need only show that the false statement had the possibility of influencing the government's decision. *Longhi*, 575 F.3d at 470. This Court finds that Relator has presented sufficient evidence that the false statement was material to FEMA's decision to award the contract to CMC. Accordingly, summary judgment is denied to all parties.

### B. The Service-Disabled-Veteran Claim

In May 2006, FEMA published a solicitation for bids on the GSM Contract. All parties agree that only firms which were primarily owned by a service-disabled-veteran were eligible to bid on

11

the contract.  The parties further agree that Laura Craig was the primary owner of CMC.  CMC submitted bids on the GSM contracts which included certifications that Craig was a service-disabled-veteran.[1]  Relator claims that CMC's certification was false.

For the purposes of government contracting, the term "service-disabled[-]veteran means a veteran with a disability that is service-connected (as defined in section 101(16) of Title 38)."  15 U.S.C. § 632.  38 U.S.C. § 101(16) provides that a disability is service-connected if it is "incurred or aggravated in line of duty in the active military, naval, or air service."

Laura Craig served in the United States Navy from 1973 until 1976.  Thus, she is clearly a veteran.  It appears that she spent most of her time in the Navy as a personnel clerk in California.  She claims to have sustained a lower back injury while on active duty in 1973.  The medical records from the Navy indicate that Ms. Craig was seen in November 1973 with complaints of lower back pain caused by lifting a heavy vacuum cleaner.  However, Ms. Craig insists that the medical records incorrectly state the cause of her injury.  She claims that she was standing on a chair in order to reach some records and that she fell off the chair and "cracked" her back against a counter.  There is no evidence in the medical record of any imaging of her back from 1973, and Ms. Craig has not

---

[1] CMC actually submitted 2 bids, one in the name of CMC and the other in the name of C-MARTEC.  C-MARTEC was a joint venture in which CMC had a 97.5% interest (a third-party firm held the remaining share).  However, for the purposes of both bids, CMC claimed to be a service disabled owned small business.  The other company in the C-MARTEC venture never claimed to be a service-disabled-veteran owned business and was a minority partner in the joint venture.  Thus, for the purpose of this case, the two bids are essentially the same.

produced any evidence that she visited any physician with complaints of back pain in the 32 years between her visit to the Navy physician in 1973 and her application to the Veterans Administration ("VA") in 2006.[2]  Ms. Craig's VA application contained a question asking her to describe how the alleged injury was service-connected.  She left this item blank.

On December 5, 2006, the VA denied Ms. Craig's claim, finding that her alleged lower back injury was not related to her military service.  Ms. Craig appealed.  CMC argues that the VA has not issued a final decision on Ms. Craig's claim.  While there is no evidence of a final decision, this Court notes that the VA has denied Ms. Craig's claim on at least four separate occasions.  Nonetheless, Ms. Craig still maintains that she has a service-connected disability, that she sustained an injury falling off a chair, and that the Navy's medical records to the contrary are incorrect.

The Court turns to the facts surrounding CMC's bid on the GSM contract.  FEMA published the solicitation for the GSM contract in May of 2006, shortly before Ms. Craig's application to the VA.  After she filed her VA application, Ms. Craig exchanged several emails with the MJI Defendants in which she expressed concern about the propriety of applying for the GSM contract without a disability determination from the VA.  As Ms. Craig recognized in her emails, if CMC were awarded

---

[2]Ms. Craig claims she first submitted an application for disability to the VA in the spring of 2005.  It appears that Ms. Craig makes this assertion in an effort to argue that she attempted to claim a service-connected disability prior to the availability of the GSM Contract.  However, other than her own self-serving testimony, there is simply no evidence in the record of such an application.  Furthermore, Ms. Craig indicated on the 2006 application that she had never filed a VA claim before, and she admits that the VA has no record of an application in 2005.

13

the contract, it was possible that a losing bidder could protest the award.  In the event of a protest, CMC would be required to submit proof of Ms. Craig's disabled status within 10 days or CMC would be deemed to not be owned by a service-disabled-veteran.  In June of 2006, Ms. Craig sent an e-mail to the MJI defendants in which she expressed additional concerns about filing the bid.  In particular, she was worried that submitting a bid for the GSM contract without a disability determination from the VA could constitute fraud.

All parties have moved for summary judgment on this claim.  However, there are several genuinely disputed material facts which preclude the entry of summary judgment.  In particular, there is a dispute as to whether Ms. Craig sustained an injury in 1973 which was connected to her military service and whether that injury qualifies her as a service-disabled-veteran.  These disputed facts preclude the Court from determining, at the summary judgment stage, whether Ms. Craig's certification to FEMA was false.

Notwithstanding the Court's decision as to CMC, the MJI Defendants argue that the service-disabled-veteran claim against them should be dismissed because there is no evidence that MJI, Medley or Jarvis knew that the claim was false.  The record contains emails between MJI and Craig wherein Medley and Jarvis encouraged her to submit the bid on the GSM contracts.  In these emails, the MJI Defendants specifically ask Ms. Craig whether she doubted her ability to obtain service-disabled-veteran status from the VA.  Ms. Craig assured MJI that she had no such doubts.  Additionally, Relator has presented no evidence from which a jury could find that MJI acted in

14

deliberate ignorance or reckless disregard of the truth or falsity of Ms. Craig's representation that she was a service-disabled-veteran. Relator insists that MJI had a duty to inquire into the truth or falsity of Ms. Craig's representation. However, the record reveals that MJI directly inquired into that exact question on at least one occasion and that Ms. Craig assured MJI that her representation was truthful. The record is simply devoid of any evidence that MJI knew or even should of known that Ms. Craig was lying about the nature of her injury.[3] Therefore, the Court grants summary judgment in favor of MJI on the service-disabled-veteran claim.

### C. Performance Claim

Defendants have moved for summary judgment on Relator's claim that CMC submitted several false claims on the MD Contract. Specifically, Relator claims that CMC billed FEMA for work that was never actually completed. In broad terms, the MD Contract required CMC to do two things: (1) perform preventative maintenance and inspections on FEMA trailers assigned to CMC, and (2) complete repairs on trailers as the need arose. CMC's performance of the contract was separated into several phases. During the first phase (referred to as "phase-in"), CMC was obligated to "perform any and all efforts necessary . . . to ensure the ability to successfully perform the tasks and activities associated with th[e]contract." Phase-in was to be completed within thirty

---

[3] By using the phrase "knew or should have known" the Court does not imply that a negligence standard applies in this case. To the contrary, the FCA's scienter requirement is much higher than negligence. However, as Relator has presented no evidence which would satisfy even a negligence standard, she is necessarily unable to prove scienter under the FCA.

days of contract award.   The contract required CMC to develop an organizational structure, purchase necessary equipment, hire staff, and otherwise prepare to perform the contract.  In exchange for work performed during the phase-in period, CMC was to be paid $624,412.03.  In order to receive this payment, CMC was required to certify that it had completed all required aspects of the phase-in project. On June 2, 2006, CMC certified that it had completed the phase-in requirements.   Of specific concern to Relator, CMC certified that it had hired 75% of the maintenance staff required for the project.  Relator alleges this certification was false because CMC had internally estimated that it would require over 100 employees to successfully perform the contract, yet the most CMC ever hired was 35-45.

Relator also alleges CMC failed to perform any inspections on the trailers during phase-in. There is no evidence in the record that CMC was required to perform inspections during phase-in and Relator does not address this particular contention in her opposition.  Thus, It appears that she has abandoned this allegation.

The second phase of the contract was the maintenance phase in which CMC was responsible for providing day-to-day maintenance on the occupied trailers, including preventative maintenance and inspections on all trailers assigned to CMC.  Relator alleges CMC lacked sufficient manpower to perform these inspections on the 11,000+ trailers it was assigned.  In an effort to make up for this shortage, Relator claims that CMC staff submitted preventative maintenance inspection ("PMI") forms which falsely indicated that inspections had been completed.

16

Consequently, Relator claims CMC was paid for inspections which it never actually performed.

Relator's claim cannot survive summary judgment.  As to the phase-in portion of her claim, Relator must show that CMC's allegedly false representation was material to the government's decision to pay CMC the phase-in fee.  However, Relator cannot show that CMC's representation regarding the number of employees hired was material.  Because the phase-in portion of the contract was phrased in general terms, CMC was not specifically required to hire 75% of its maintenance staff.  All CMC was required to do was prepare to perform the contract.  It is undisputed that CMC hired some maintenance staff during this period.  The face of the contract did not impose a requirement that CMC hire any specific percentage of staff.  Thus, Relator cannot prove that CMC's representation regarding the percentage of staff hired had any effect on the government's decision to pay the invoice.  Furthermore, the manpower representation was one of fifteen representations CMC made in connection with the phase-in invoice.  Relator has not alleged that any of the other fourteen representations was false, or that the absence of the manpower representation would have caused the government to deny the claim.

Furthermore, as to the PMI claim, Relator has only generally alleged that CMC employees falsified forms.  While she claims that FEMA paid for inspections which never occurred, she has not identified a single invoice which evidences that CMC was actually paid for false PMI inspections. Relator has not submitted a single false PMI form or identified a single trailer on which PMI forms were falsely completed.  Therefore, Relator's performance claim is dismissed with prejudice.

17

**II. Motions to Exclude Experts – Docs. 248 & 259**

Relator seeks to exclude the testimony of Defendants experts, Professor Yukins and Mr. Franco, while Defendants seek to exclude the testimony of Relator's experts, Professor Morris and Mr. Klingelhofer.  The parties do not seriously dispute either the qualifications or methodology of any of the experts.  Additionally, the Court's independent review reveals that each expert is sufficiently qualified and their methodology sound.  However, the parties contend the opinions will not assist the jury in resolving any disputed issues of fact.

The Fifth Circuit has repeatedly held that experts may not offer opinions which are merely disguised conclusions of law.  *Snap-Drape, Inc. v. C.I.R.*, 98 F.3d 194, 198 (5th Cir. 1996) (collecting cases).  It is the court's duty to determine the applicable law and to instruct the jury accordingly. *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997); *cf. Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").  Therefore, courts have rejected expert testimony which purports to tell the jury what the law is, or what legal conclusion to reach. *Estate of Sowell v. United States*, 198 F.3d 169, 172 (5th Cir. 1999).  However, courts have permitted legal experts to testify as to factual matters such as the definition of terms of art.  *Id.*  In light of these principles, it is necessary to examine the opinions of each expert in turn.

**A. Professor Glen Morris**

18

Professor Morris is a professor of law at Louisiana State University where he teaches courses in business associations, contracts and corporate finance.  Relator retained Professor Morris to offer an opinion regarding whether the relationship between CMC and MJI constitutes a joint venture under Louisiana law and/or the principles embodied in the Uniform Partnership Act. In his report, Professor Morris offers a detailed explanation of both Louisiana partnership law and the Uniform Partnership Act.  Based on these legal principles, Professor Morris opines that the relationship between CMC and MJI constitutes a joint venture under either body of law.

These opinions are inadmissible because they purport to define the applicable law and draw a legal conclusion therefrom.  Legal opinions of this type have long been excluded by the courts of the Fifth Circuit.  *See Sowell*, 198 F.3d at 172.  Therefore, the Court grants Defendants' Motion in part, and Professor Morris will not be permitted to testify at trial.

**B. Victor Klingelhofer**

Mr. Klingelhofer is an attorney who practices primarily in government contracting law. Relator retained Mr. Klingelhofer to explain to the jury the general process through which an individual obtains service-disabled-veteran status as well as the bidding process associated with service-disabled-veteran-owned small-business-concern contracts.   This type of general explanation is consistent with the sort of testimony other courts have permitted in FCA cases.  *See U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296 (6th Cir. 1998).  Mr. Klingelhofer's report does not purport to instruct the jury on the applicable law, nor does he purport to offer an

19

opinion on whether Ms. Craig qualifies as a service-disabled-veteran.  Therefore, Mr. Klingelhofer's testimony is admissible.

### C. Professor Christopher Yukins

Professor Yukins is a professor of government contract law of George Washington University.  CMC retained Professor Yukins to offer two basic opinions.  First, Professor Yukins opines that the question of whether CMC and MJI formed a joint venture with regard to the MD contract is governed by federal procurement regulations and that, under those regulations, no joint venture was formed.  Second, he explains the general process through which a company submits a bid for a service-disabled-veteran-owned-small-business-concern contract.  Professor Yukins's first opinion is excluded for the same reasons articulated with regard to Professor Morris. However, his second opinion will be permitted for the same reasons articulated with regard to Mr. Klingelhofer.

### D. Antonio Franco

Mr. Franco is an attorney who practices primarily in government contracting law.  He was retained by MJI in order to provide opinions which are, for the most part, similar to those offered by Professor Yukins.  For reasons already articulated, Mr. Franco will not be permitted to offer any opinions regarding the MD Contract.  However, consistent with the Court's other rulings herein, Mr. Franco will be permitted to testify regarding the service-disabled-veteran issue.

The Court pauses to add one additional point applicable to all experts.  While the Court will

allow expert testimony regarding the service-disabled-veteran issue only, that testimony will be limited. No expert will be permitted to offer any legal conclusion. Nor will any expert be permitted to offer an opinion regarding whether Ms. Craig qualifies as a service-disabled-veteran.

### III. Motion for Sanctions – Doc. 254

MJI, Medley and Jarvis, have filed a Motion for Sanctions against the United States. CMC and Craig have filed a Motion to Join the Motion for Sanctions (Doc. 270). Because the Court denies the Motion for Sanctions, the Motion to Join is denied as moot.

MJI asks this Court to dismiss the entire case as a sanction against the United States for spoilation. A claim for spoliation of evidence has three elements. First, the spoiling party must have controlled the evidence and been under an obligation to preserve it at the time of destruction. *Menges v. Cliffs Drilling Co.*, No. Civ.A. 99–2159, 2000 WL 765082, at *2 (E.D. La. June 12, 2000). This obligation arises when a party knows or should have known that the spoiled evidence was relevant to current or future litigation. *Hunt v. Marquette Transp. Co. Gulf-Inland, LLC.*, No. 09–6055, 2011 WL 3924926, at *2 (E.D. La. Aug. 5, 2011). Second, the evidence must have been intentionally destroyed. *Lafayette*, 2005 WL 1038495 at *3. Negligent destruction of evidence is not enough. *Vick v. Texas Emp't Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975). Third, the moving party must show that the spoiling party acted in bad faith. *Condrey v. SunTrust Bank of Georgia*, 431 F.3d 191, 203 (5th Cir. 2005); *Wise*, 221 F.3d at 156. The burden of proving bad faith lies with the moving party. *Lafayette*, 2005 WL 1038495, at *4 (citing *King v. Illinois Cent. R.R.*, 337

21

F.3d 550, 556 (5th Cir. 2003)).

MJI claims the United States intentionally destroyed most of the documents related to the MD Contracts. During the discovery process in this matter, MJI requested that the United States produce, *inter alia*, copies of all the bid proposals submitted to FEMA, documents related to FEMA's evaluation of the proposals, documents related to FEMA's final decision, and documents related to CMC's performance on the Contracts.  The government admits that it has been unable to produce the vast majority of the documents requested.  In fact, of the thousands of pages of documents MJI requested, the United States had produced only twelve pages of responsive documents at the time of oral argument.[4]  The government concedes that it was under an obligation to preserve the documents at issue.  Therefore, in order for this Court to award sanctions MJI must prove that FEMA intentionally destroyed the documents in bad faith.

MJI has submitted no evidence that the documents were destroyed, much less that they were destroyed intentionally or in bad faith.  Furthermore, the efforts of the United States to locate these documents, efforts which continue to date, indicate a lack of bad faith on the part of the government.  Accordingly, the Motion for Sanctions is denied.

### IV. Motion *in limine* – Damages Evidence (Docs. 316 & 321)

---

[4] Since oral argument, counsel for the United States has notified the Court that additional documents were located and would be produced in short order.  As of the writing of this Order, the Court has no information regarding how many additional pages have been produced.  However, based on the information received from counsel for the United States, it appears that a substantial number of additional documents have been located.

Relator and Defendants have each filed motions asking this Court to decide the manner in which damages will be calculated in this case.  The parties have presented two alternative methods for calculating damages.[5]

The first method, proposed by Defendants, is called the "benefit of the bargain."  Under this calculation, the jury first determines how much the government paid "as a result of the false claim."  The jury then deducts the value of the performance the government actually received on the contract.  This method ensures the government is only awarded the difference between the value of what it intended to receive under the contract and the value of the actual performance rendered.  Alternatively, Relator contends the Court should award the full amounts paid under the contracts.  Neither the Fifth Circuit nor any other circuit court has directly addressed the proper method of calculating damages for a fraudulent inducement claim under the False Claims Act.  However, a review of the relevant case law is instructive.

The D.C. Circuit addressed the proper methodology for calculating damages in a FCA case in *United States v. TDC Management. Corp., Inc.*, 288 F.3d 421 (D.C. Cir. 2002).  TDC had contracted with the Department of Transportation to implement and administer a program designed to assist minority-owned business in securing bonding from sureties when bidding on large construction

---

[5] Defendants present one additional argument related to the calculation of damages.  Defendants' argument is based on their assertion that Relator asks this Court to retroactively apply recent amendments to a federal statute, 15 U.S.C. § 563(w).  This argument is rejected.  Relator concedes, and the Court agrees, that § 563(w) has no bearing on this case.  Accordingly, Defendants' arguments related to the retroactive applicability of the statute are moot.

projects.  *United States v. TDC Mgmt. Corp., Inc.*, 24 F.3d 292, 294 (D.C. Cir. 1994).[6]  The contract

required TDC to seek private investors who would be willing to contribute management assistance

and collateral to disadvantaged businesses bidding on government contracts in exchange for a

share of the profits generated by successful bids.  *Id.*  TDC was to play the role of an impartial

intermediary in arranging these relationships.  *Id.*  TDC was successful in securing investors

pursuant to the contract.  *Id.*  However, the government later discovered that TDC had attempted

to obtain a financial stake in the investor-business relationships and brought suit pursuant to the

FCA.  *Id.*  After final judgment in favor of the United States, TDC appealed, arguing that the

government was not entitled to any damages because the government "got what it paid for" under

the contract.  *TDC Mgmt.*, 288 F.3d at 427.

The D.C. Circuit began its analysis with the general rule in FCA cases that the government

may only recover the difference in value between what it paid for and what it received (often

referred to as the 'benefit of the bargain').  *Id*. at 428.  However, the Court held that "the district

court [was permitted] to find that the value of the 'best efforts' provided by TDC [were] vitiated

by TDC's fraudulent concealment of its rent-seeking behavior."  *Id.* at 428.  In other words, once

TDC abandoned its impartial role, the program no longer had any value to the government.  *Id.*

Thus, the court concluded it was appropriate to award the total contract value as damages.  *Id.*

---

[6] The D.C. Circuit issued an opinion in *TDC Management* several years before the opinion addressing the damages issue.  Because the first opinion contained a complete description of the facts, and the second one did not, the Court cites to the first opinion for the facts of the case.

The D.C. Circuit addressed the issue of damages calculation again in *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257 (D.C. Cir. 2010). In *Science Applications*, the Nuclear Regulatory Commission ("NRC") contracted with Science Applications International Corporation ("SAIC") for the provision of technical advisory services. *Id.* at 1261. Specifically, SAIC agreed to assist the NRC in developing regulations governing the recycling of radioactive waste. *Id.* The initial contract included several provisions designed to prevent SAIC from developing conflicts of interest relative to the contract. *Id.* at 1262. However, the government later discovered that SAIC had developed several conflicts of interest but had failed to disclose those conflicts to the government. *Id.* at 1262–64. The government brought suit pursuant to the FCA and prevailed at trial. *Id.* at 1261. After a jury returned a verdict against it, SAIC appealed. *Id.* The D.C. Circuit reversed and remanded on grounds unrelated to the calculation of damages. *Id.* at 1280. However, in light of the fact that it was remanding the case for a new trial, the court elected to consider SAIC's arguments regarding the appropriate damages calculation. *Id.* at 1277. SAIC argued that the government was not entitled to any damages because it had received everything it paid for under the contract. The D.C. Circuit disagreed. The court held that the government must show the difference between the amount of money it paid and the value of what it received (the benefit of the bargain). *Id.* at 1279. However, the court also recognized that, in some cases, defendants fraudulently obtain payments through programs designed to benefit third parties. *Id.* In such a case, the court held, the government will easily be able to show that it received nothing

25

of value and thus that all payments are recoverable as damages.  *Id.*  The court cited *TDC Management*, *Longhi* and *Rogan* as examples of such cases.[7]  *Id.*  The court ruled that SAIC would be permitted to present evidence and arguments to the jury regarding the value of what the government received under the contract, and that the government would be permitted to argue that SAIC's fraudulent conducted rendered SAIC's performance useless.  *Id.* at 1279–80.

*Longhi* is the closest Fifth Circuit decision on point.  *Longhi,* 575 F.3d 458.  In *Longhi*, the defendants were awarded a government grant designed to encourage disadvantaged businesses to develop new, marketable, technology.  *Id*. at 462–64.  After the grant was awarded, the government discovered that the defendants had lied regarding their eligibility for the grant and brought suit pursuant to the FCA.  *Id*. at 463.  After the district court granted judgment to the government, the defendants appealed, arguing that they had performed all of the research required under the agreement and that they had actually produced a marketable product, thus fulfilling the goal of the program.  *Id*. at 472.  Therefore, the defendants argued the government had not sustained any damages as a result of the fraudulent statement.  *Id*.  The Fifth Circuit disagreed.  The court held that the primary purpose of the government program was not to benefit the government, but rather to benefit third-parties (*i.e.* disadvantaged businesses).  *Id*. at 473. Therefore, the defendants had completely frustrated the purpose of the government program

---

[7] *Longhi* and *Rogan* are discussed in detail *infra*.

because the money paid to the defendants should have gone to a properly qualified disadvantaged business. *Id*. As a result, the Fifth Circuit held that the proper measure of damages was the full amounts paid to the defendants under the contract. *Id*.

The Seventh Circuit also addressed the proper method for calculating damages in *United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008). In *Rogan,* the government alleged that the defendants obtained Medicare and Medicaid payments fraudulently. *Id*. at 451. Specifically, the defendants obtained Medicare/Medicaid patients by paying other doctors kickbacks in exchange for referrals. *Id*. at 451–52. Through the FCA, the government sought recovery of all payments made to defendants under Medicare/Medicaid based on the theory that defendants would not have received any payments in the absence of the fraudulent conduct. *Id*. at 452. Defendants argued that, because they had performed all of the services for which they were paid and the patients actually needed those services, the government had not sustained any damages. *Id*. at 453. The Seventh Circuit disagreed. The court found that the defendants were liable for the full amounts paid to them by the United States because the Medicare/Medicaid program did not provide a tangible benefit to the government. *Id*. The court recognized that the government likely would have had to pay for the medical services regardless. *Id*. Nonetheless, the defendants had obtained money from the United States Treasury under false pretenses, and the government received no tangible benefit in return. Thus the proper measure of damages was the entire amount paid on the contract. *Id*.

27

This Court believes that a general rule as to the proper calculation of damages can be deduced from the foregoing case law.  The cases appear to hold that, as a general rule, the government may only recover the damages it actually sustains as a result of a false or fraudulent claim.  *See Sci. Applications*, 626 F.3d at 1279.  In order to determine the government's "actual damages" the Court must first determine the amount which was paid out because of the false claim (the governments "gross damages").  *Id*.  In fraudulent inducement cases, where the government claims that it would not have awarded the contract in the absence of the false statement, the gross damages are the total amounts paid under the contract.  *See Id.; Longhi,* 575 F.3d at 473.  Then, the Court must subtract from the "gross damages" the value of any performance the government received under the contract (the "benefit of the bargain").  *Sci. Applications*, 626 F.3d at 1279.  The result is the government's actual damages.

However, as several courts have recognized, there will be cases where the government receives nothing of value from the defendant.  In those cases, the governments gross damages and its "actual damages" will be the same, because the value of the performance is zero.  There are several cases where courts have been able to determine, as a matter of law, that the defendant's performance was worthless to the government.  *See TDC Mgmt.*, 288 F.3d 421; *Rogan*, 517 F.3d 449; *Longhi*, 575 F.3d 458.  In other cases, such as *Science Applications*, there will be questions of fact regarding whether the defendant's fraudulent conduct completely vitiated the government's purpose in awarding the contract at issue.  *See Sci. Applications Int'l Corp.*, 626 F.3d 1257.  In the

latter category of cases, the government should be permitted to argue to the jury that the defendant's performance was rendered worthless by the false statements and the defendants should be permitted to argue that their performance was of some value to the government despite the false statements.  As the Court explains below, the instant matter falls into the latter category.

Relator argues that Defendants' false representations regarding their qualifications for the contracts completely vitiated the government's purpose in awarding the contracts (benefitting small businesses and service-disabled-veterans).  Alternatively, Defendants argue the government received all of the maintenance services for which it bargained.  This is a factual dispute for the jury to decide.  The jury will be instructed to determine the value of Defendants' performance to the government.  Based on the answer provided by the jury, the Court will then determine the government's "actual damages" in this matter by subtracting the benefit of the bargain from the total amounts paid "because of the false claims."[8]

In light of the Court's ruling, there is one remaining issue: the manner in which the government's damages will be trebled.  The FCA requires the Court to treble any damages awarded. 31 U.S.C. § 3729.  Relator argues that the government's gross damages should be trebled

---

[8] As to the GSM Contracts, there is no dispute that the amount paid because of the false claim is the total amount paid under the contracts.  However, as to the MD Contract, there is some dispute regarding how much was paid to CMC because of the allegedly false claim.  CMC claims that some of the amounts it received were paid under contracts subsequently bid by the government which did not contain a local preference.  Therefore, as to the MD contract only, the jury will have to decide the precise amount paid because of the allegedly false claim.

prior to any reduction for the value of the services the government received.  Alternatively, Defendants argue that the Court should only treble the government's "actual damages."

Defendants' argument is based on *U.S. v. Bornstein*, 423 U.S. 303 (1976).  In *Bornstein*, the government sued a subcontractor under the FCA for providing poor quality electron tubes to the United States.  *Id*. at 307–08.  In 1962, the government contracted with Model Engineering for the provision of radio kits.  *Id*. at 307.  One of the component parts of the radio kits was an electron tube manufactured by the *Bornstein* defendant, United National Labs ("United").  *Id*.  The contract provided that the electron tubes were required to meet specific quality requirements, but United instead provided lower quality tubes falsely labeled to suggest compliance with the quality requirements.  *Id*.  After the fraud was discovered, the government was forced to pay $40.82 to replace each of the 397 defective tubes.  *Id*.  Prior to trial, the government recovered $40.72 per tube in compensation from Model Engineering.  *Id*.  After the trial court found United liable under the FCA, it awarded damages in the amount of $0.10 per tube (the difference between the damages sustained by the government and the compensation it had already received), and doubled those damages pursuant to the FCA.[9]  *Id*. at 308.  The government appealed, arguing that the total damages it had sustained ($40.82 per tube) should be doubled prior to assessing a reduction for payments it had already received.  *Id.*  The Supreme Court agreed, holding that the government's

---

[9] When *Bornstein* was decided, the FCA provided for double damages.  The Act has since been amended to provide for treble damages.

total damages should be doubled prior to assessing any reduction for compensation the government had already received.  *Id*. at 314.

Defendants argue that the rule of *Bornstein* only applies when the government has been compensated prior to trial.  Additionally, Defendants argue that *Bornstein* held that only the government's actual damages should be doubled (now tripled).  However, Defendants' reading of *Bornstein* is inconsistent with the Fifth Circuit's reading of the case.

In *Longhi*, the Fifth Circuit interpreted *Bornstein* to hold that "when deducting the 'bargain' received from a defendant, a court must begin with the already doubled (and now tripled) amount."  *Longhi*, 575 F.3d at 473 (citing *Bornstein*, 423 U.S. at 314).  The *Longhi* court explicitly rejected the precise argument Defendants assert here:

> The[] [amicus argues], however, that in calculating damages the court should subtract the value of the benefit that the Defendants conferred on the Government from the amount the Government paid to the Defendants and then treble this 'actual-damages' figure. The proposed method does not comport with the Supreme Court's holding in *Bornstein* or our holding in *Thomas* and we reject it.

*Longhi*, 575 F.3d at 473 n.11.  Therefore, given the Fifth Circuit's holding in *Longhi*, this Court is bound to apply the damages calculation endorsed therein.  If Relator is able to establish liability at trial, the Court will treble the total amount the government paid because of the false claim and the value of any benefit the government received from Defendants' performance will be deducted

from the trebled amount.[10]

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment as to Relator's performance claim.  Relator's performance claim is DISMISSED WITH PREJUDICE. Additionally, the Court GRANTS IN PART Defendants', MJI, Medley and Jarvis, Motion for Summary Judgment.  Relator's service-disabled-veteran claim is DISMISSED WITH PREJUDICE, as to MJI, Medley and Jarvis only.  Furthermore, the Court STRIKES Professor Morris as an expert witness in this matter and limits the testimony of the remaining experts as detailed *supra*.  Finally, the Court DENIES Defendants' Motion for Sanctions and rules on the remaining motions as outlined herein.

New Orleans, Louisiana, this 24th day of April, 2014.

JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE

---

[10] The Court notes that other circuits have taken a different approach to this question, holding that only the government's actual damages are trebled.  *See U.S. v. Anchor Mortgage Corp.*, 711 F.3d 745, 750 (7th Cir. 2013).  Additionally, as noted in *Anchor Mortgage*, several other circuits have impliedly indicated that a net trebling approach is preferable.  *See Id.* (collecting cases).  While the Court recognizes that the Ninth Circuit appears to agree with the Fifth Circuit on this issue, *U.S. v. Eghbal*, 548 F.3d 1281, 1285 (9th Cir. 2008), the overwhelming weight of authority supports the rule that only net damages should be trebled. Nonetheless, this Court is bound to apply the rule enunciated by the Fifth Circuit.